**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0282n.06

No. 18-4187

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
May 19, 2020
DEBORAH S. HUNT, Clerk

CHRISTOPHER D. RARICK,           )
            )
     **Petitioner-Appellant,**      )     **ON APPEAL** FROM THE
            )     THE UNITED STATES DISTRICT
v.                      )     COURT FOR THE NORTHERN
            )     DISTRICT OF OHIO
            )
UNITED STATES OF AMERICA,    )     **OPINION**
            )
     **Respondent-Appellee.**     )
            )

**BEFORE: NORRIS, MOORE, and DONALD, Circuit Judges.**

**ALAN E. NORRIS, Circuit Judge.** Petitioner Christopher Rarick contends that he received ineffective assistance from both trial and appellate counsel in connection with a search of his cell phone, which was conducted after he was arrested for obstruction of official business, Ohio Rev. Code § 2921.31, and for driving with a suspended license. That search uncovered evidence that petitioner had sexually exploited children and had possessed child pornography. Based upon that evidence, petitioner was charged with federal crimes to which he later pleaded guilty.

In the instant motion to vacate his sentence, brought pursuant to 28 U.S.C. § 2255, petitioner contends that counsel proved ineffective by failing to argue that his arrest for obstruction of official business lacked probable cause under Ohio law, and because the search of his cell phone was related solely to the obstruction charge, the evidence gleaned from the search should have been suppressed.

**I.**

This court summarized the events that led to petitioner's prosecution in an opinion

affirming the judgment on direct appeal:

> On February 14, 2013, Christopher Rarick was stopped by Ashland City Police Officer Kim Mager outside a Cheap Tobacco store in Ashland, Ohio, after Officer Mager conducted a LEADS inquiry on the car Rarick was driving and determined the registered owner of the vehicle, Rarick, had a suspended license. Accordingly, Officer Mager stopped Rarick to determine whether he was the registered owner and was thus driving with a suspended license. During the stop, Rarick became argumentative: he challenged the officer's authority to ask his name or run his license plate, and he refused to produce his driver's license, insurance information, or vehicle registration. At some point, Rarick removed his smartphone from his pocket, held it up, approached the officer, and stated that he was recording her. The officer took the phone, placed it on the trunk of Rarick's car, and ordered Rarick to remain in his car while she conducted her work. Rarick grabbed his phone from the trunk and retreated to the passenger seat of his car, whereupon the officer approached him to find out what he was doing. The officer saw that Rarick was manipulating his phone, and she ordered him to stop and to put his hands on the dashboard. Saying that he wanted to record what was happening, Rarick continued to manipulate his phone. Eventually he put the phone down and placed his hands on the dashboard. After backup arrived, Rarick was arrested and taken to jail, where he was cited for obstructing official business and driving with a suspended license. His cell phone—a black Samsung Nexus S 4G model SPH–D720—was seized as evidence.

> Rarick refused to consent to a search of his phone. Lieutenant Joel Icenhour then filed an affidavit for a search warrant. In the affidavit, Icenhour stated that he had good cause to believe that evidence relating to the offense of obstructing official business, a violation of Ohio Revised Code § 2921.31, was likely stored in a digital format on Rarick's phone, which had been taken from Rarick at the time of his arrest. Icenhour's affidavit stated that "[t]his belief is based on a traffic stop conducted by Officer Kimberly Mager." Search Warrant Aff. 1, ECF No. 19–1. An Ohio state judge issued a warrant that authorized the search and seizure of, among other things, "[a]ll information within" Rarick's phone, "including but not limited to machine-readable data, all previously erased data, and any personal communications"; "[a]ny and all electronic data contained in the device's memory as well as on other internal, external or removable media to include but not necessarily limited to . . . images, voice memos, photographs, [and] videos"; and "[a]ll other fruits and instrumentalities of crime at the present time unknown." Search Warrant 1–2, ECF No. 19–2.

Icenhour then executed the search warrant by connecting Rarick's phone to a computer that was running Susteen Secure View 3 forensic cell phone data recovery software. Icenhour downloaded the phone's data onto his computer. After the data had been downloaded, Icenhour testified, "a little box show[ed] up" on his computer screen, saying "Do you want to view the report?" Hr'g Tr. 28:24–25, Oct. 15, 2013, ECF. No. 54. Icenhour clicked "View the report," and his computer displayed the downloaded data, which included technical information about the phone itself, call logs, contacts, pictures, audio files, video files, and other data. Hr'g Tr. 28:25–29:8. The report displayed thumbnail images of the pictures and video files; for the video files, the thumbnail image was the first frame of the video. Icenhour acknowledged that it was possible to get an idea of the contents of the pictures and video files by looking at the thumbnails. Icenhour looked for video and audio files because Rarick had told the arresting officer that he was recording her. As Icenhour scrolled down into the section containing video files, he scrolled past the pictures, and he could see from the thumbnails that the pictures contained child pornography. Icenhour then scrolled further down, where he spotted a video with a thumbnail that he thought looked like a beige wall. He testified that he opened the video because he thought that the thumbnail might depict the wall of the Cheap Tobacco store where the stop occurred. It did not—it too contained child pornography.

At this point, Icenhour shut off the video and went to tell his chief of police what he had found. After consulting with the prosecutor's office, they applied for and received a second warrant, this time asserting probable cause to search for evidence of child pornography and several related offenses under Ohio law. Executing the second warrant, Icenhour found numerous pictures and videos containing child pornography, many of which appeared to have been taken with Rarick's phone. The police then arrested Rarick and applied for and received a third search warrant for his vehicle and residence.

A federal grand jury indicted Rarick on two counts of exploiting children in violation of 18 U.S.C. § 2251(a) and one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Arguing, *inter alia*, that the first search warrant was unconstitutionally broad and had been executed in an unreasonable manner, Rarick moved to suppress all of the evidence found on his smartphone and the fruits obtained from the search. The district court denied his motion. Rarick then pled guilty but preserved his right to appeal the district court's denial of his motion to suppress. The court ordered Rarick incarcerated for concurrent sentences of 188 months on each of the two exploiting-children counts and a concurrent sentence of 120 months on the child-pornography count.

*United States v. Rarick*, 636 F. App'x 911, 911-13 (6th Cir. 2016) (footnote omitted). Pertinent to

the sole issue raised in this appeal, the opinion noted that "Rarick does not dispute the existence

of probable cause supporting the first search warrant" and attacked it only as "overly broad." *Id.*

at 914. This court affirmed the judgment of the district court denying the motion to suppress. *Id.* at 916.

Petitioner subsequently filed a motion to vacate his sentence, alleging that he received ineffective assistance because counsel failed to argue that the arresting officers lacked probable cause under Ohio's obstruction of official business statute.

The district court disagreed based upon the behavior that led to the arrest for obstruction. Relying primarily upon Officer Mager's police report, the district court concluded that petitioner's resistance went beyond "mere argument" and that the arrest for obstruction was thus supported by probable cause. Specifically, petitioner told Officer Mager during the arrest that "I have killed people." Mager's police report included further details:

> He then stated that he wanted to record me. I told him that for my safety and his, I wanted him to get in the car and sit down. He refused again and paced about the area, from side to side and forward, in my direction. I pointed my taser at Rarick ordering him to stay back from me and to sit in the car. I repeated my demands multiple times and told Rarick that I was going to use the Taser on him as well as arrest him. Rarick unyieldingly declared that he was not going to get in the car and that he would not be arrested by me. Rarick at this point qualified his remark about having killed people by saying he had over 200 confirmed kills while serving in the military. He demanded [sic] that he fought for our rights and that I wasn't going to violate his. . . . Rarick continued to rant about my violation of his rights and about police officers in general as he unlocked the passenger door. Rarick subsequently lunged toward the trunk and grabbed his phone. He then sat in the passenger side of the car and began manipulating his phone. I ordered him to place his hands on the dash. He would not comply. I held my Taser on Rarick ordering him to put his hands on the dash and to stop moving around. Rarick asserted that he would not talk to me or follow my orders. . . . He related that he wanted to record me. I told him I was fine with being recorded but that I wanted his hands on the dash, for my safety and his. Rarick did not comply. He appeared to be experiencing difficulty in getting his phone to record. His agitation increased. As he yelled at me, he began to move his legs outside the car. Officer Neumann was approaching from a distance and his siren was audibly noticed by Rarick, who commented about me having backup. He moved his legs towards the front of the car after successfully getting the phone in record mode, placed the phone on the dash, and placed both hands on the dash.

4

Based largely upon this evidence, the district court dismissed the motion to vacate; it also denied a certificate of appealability. We subsequently granted a certificate of appealability on the sole issue of probable cause.

**II.**

In reviewing the denial of a Section 2255 motion, this court applies de novo review to the district court's resolution of legal issues while upholding its factual findings unless they are clearly erroneous. *Greer v. United States*, 938 F.3d 766, 770 (6th Cir. 2019).

The requirements necessary to establish ineffective assistance are well-established:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). In making this analysis, reviewing courts must accord counsel a high degree of deference. *Id.* at 689. To wit, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quotation omitted).

The Ohio statute criminalizing obstruction of official business provides as follows:

> (A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

(B) Whoever violates this section is guilty of obstructing official business. Except as otherwise provided in this division, obstructing official business is a misdemeanor of the second degree. If a violation of this section creates a risk of physical harm to any person, obstructing official business is a felony of the fifth degree.

Ohio Rev. Code § 2921.31.

Petitioner's position is straightforward: "Had trial counsel asserted that Rarick did not perform any affirmative act, other than recording police which he had all legal privilege to do, the cell phone would have been suppressed and all subsequent evidence would have been subsequently suppressed as fruit [of the poisonous tree]." It is true that declining to obey an officer's request does not fall within the scope of Ohio's obstruction of official business statute. *See*, *e.g.*, *State v. McCrone*, 580 N.E.2d 468, 470 (Ohio Ct. App. 1989) (refusing to produce a driver's license when requested is not an "unprivileged act" as required by the obstruction statute); *City of Cleveland Heights v. Lewis*, 933 N.E.2d 1146, 1151 (Ohio Ct. App. 2010) (failure to obey an officer's request or refusal to provide information does not render one guilty of obstruction); *N. Ridgeville v. Reichbaum*, 677 N.E.2d 1245, 1248 (Ohio Ct. App. 1996) (holding that an affirmative act is required to support a finding that an individual was guilty of obstruction).

Our independent review of the record below convinces us that this is a case in which petitioner "engage[d] in some affirmative or overt act or undertaking that hampers or impedes a public official in the performance of the official's duties." *State v. Crowell*, 938 N.E.2d 1115, 1117 (Ohio Ct. App. 2010) (citation omitted). In reaching this conclusion, we are not implying that petitioner obstructed official business by recording his encounter with Officer Mager. However, when petitioner advanced toward Officer Mager and refused to obey her command to step back, leading her to draw her taser and point it at him until he finally backed away, his conduct went beyond nonfeasance or disobedience. It is not mere nonfeasance when a defendant disobeys

an order *and* undertakes an "additional affirmative act." *Osberry v. Slusher*, 750 F. App'x 385, 393 (6th Cir. 2018) (citing cases). For example, the court in *State v. Casey* concluded that "standing alone, refusing to talk is not obstruction," but then distinguished the defendant's behavior, explaining that the defendant not only refused the officer's demand to come over and speak with the officer but also walked away from the officer and then ignored the officer's repeated demands to stop walking away and to put his hands on the back of his head. 85 N.E.3d 1283, 1292–93 (Ohio Ct. App. 2017); *see also State v. Harris*, 121 N.E.3d 21, 27 (Ohio Ct. App. 2018).

As already related, petitioner did more than refuse to respond to Officer Mager's requests. After Officer Mager ordered him multiple times to get back into his car, petitioner stepped toward her, demanding that she give back his phone. This led her to instruct him to get in the car "for my safety and his." Then, while he was pacing, he again stepped toward Officer Mager. She "pointed [her] taser at Rarick ordering him to stay back from [her] and to sit in the car." He did not step back despite Mager's multiple orders to do so. Eventually, petitioner retreated when Officer Mager, still training her taser on him, threatened to count to three. He did not simply stand by his car and refuse to get in it; he approached Officer Mager twice in the midst of a heated traffic stop and then failed to heed her orders to step back, leading Officer Mager to resort to the threat of her taser to obtain his compliance. *See State v. Stewart*, No. 86411, 2006 WL 440153, at *4 (Ohio Ct. App. Feb. 23, 2006) (concluding that the defendant engaged in an affirmative act when the defendant approached the officer in "an aggressive manner" and "would not leave despite numerous warnings").

Petitioner's conduct also impeded Officer Mager's efforts to investigate his suspended license. A defendant must actually hamper and impede the officer's performance of her duties, but this does not mean that the defendant must have prevented the officer from performing her

duties at all; the question is "whether the defendant made the officer's performance of that duty more difficult." *Harris*, 121 N.E.3d at 28; *see also Howse v. Hodous*, 953 F.3d 402, 408 (6th Cir. 2020) (stating that an individual "may be convicted if they make it 'more difficult' for law enforcement to gain control of a situation" (quoting *State v. Florence*, No. CA2013-08-148, 2014 WL 2526069, at *3 (Ohio Ct. App. June 2, 2014))). Officer Mager concluded that petitioner's license was suspended before the stop began, but her investigation was not yet complete given her statement to petitioner that she would check whether he had in fact addressed his suspended license. His conduct at least made it more difficult for Officer Mager to conclude her investigation because she was drawn away from it by his conduct.

Given these considerations, we conclude that probable cause existed to arrest petitioner for obstructing official business. Consequently, counsel's failure to raise probable cause as defense does not constitute ineffective assistance because petitioner did not suffer prejudice.

**III.**

The judgment is **affirmed**.